Zeno J. Pucci v. Commissioner.
Pucci v. Commissioner
Docket No. 28078.
United States Tax Court
1951 Tax Ct. Memo LEXIS 215; 10 T.C.M. (CCH) 529; T.C.M. (RIA) 51164; May 31, 1951
*215 John H. McEvers, Esq., and G. Lee Burns, Esq., for petitioner. Marvin E. Hagen, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner challenges respondent's determination of an income and victory tax deficiency of $481.97 for 1943, and an income tax deficiency of $12,057.90 for 1944. Certain adjustments are not contested and one issue has been abandoned by petitioner. The issues in dispute are whether deductions for salaries paid in 1943 and 1944 to petitioner's son were reasonable in amount, and whether in 1944 petitioner and his son entered into a bona fide partnership. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, a resident of Kansas City, Missouri, filed his returns with the collector of internal revenue for the sixth district of Missouri. From 1935 or 1936 to 1939, petitioner and another individual operated a wholesale beer distributing business in partnership. From January 1, 1939, to June 30, 1944, petitioner owned and operated the same business as a sole proprietorship under the name of Central Brew Sales Company with principal office *216 and place of business in Kansas City, Missouri. Prior to July 1, 1944, petitioner acquired the building in which the business was located. Petitioner's son, Gregory L. Pucci, was born May 5, 1923. During the period from 1925 to 1937 petitioner received money for Gregory's benefit in the approximate amount of $3,000. That sum came from various sources, including proceeds of $1,000 from a railroad accident settlement, $500 from an insurance policy paid up by Gregory's grandmother, $375 from a savings and loan account, and sundry gifts and savings. Gregory received no notes. Petitioner used the money in his business. Petitioner kept a record of the account and computed interest. Prior to July 1, 1944, no repayments were made by petitioner to Gregory. From about 1936 or 1937, when he began high school, Gregory worked for petitioner during his spare time on weekends, holidays, and summer vacations. He performed general duties, including work in the warehouse, on beer trucks, and loading and unloading merchandise. During 1942 he attended Rockhurst College in Kansas City, and in the summer of that year he attended half-day sessions in summer school. He finished his third academic college *217 year in June 1943. From June 1943 to November 1943 he worked in petitioner's business, doing clerical, sales, and other work. In November 1943 he enrolled in the medical school of St. Louis University at St. Louis, Missouri. He took an accelerated course of studies and remained in St. Louis until June 1948, when he graduated. The outbreak of the war caused restrictions upon the use of metal, which resulted in a shortage of bottling caps or crowns. The shortage became acute in the early part of 1942. Petitioner's supply of beer sharply decreased, and in 1942, due to the lack of crowns, certain breweries ceased supplying petitioner. Crowns were used at that time by wholesalers as a means of barter with brewing companies, and they were a necessity to petitioner's business, since without them he could not obtain beer. Petitioner adopted various methods of obtaining crowns, including the gathering and reconditioning of old crowns, in which Gregory participated, in addition to his other sparetime work. However, defects and leaks in reconditioned crowns made them unsatisfactory. In 1942 Gregory conceived the notion that crowns could be made from scrap metal, and he worked on the idea *218 of developing a dye. Gregory consulted with petitioner and, working together, they secured the assistance of several machinists. Finally a process was perfected for making crowns from flat pieces of scrap metal by means of a dye used with a punch press. Subsequently petitioner's business salvaged scrap metal from various sources throughout the city and converted the metal into bottle caps. The acquisition of a supply of crowns enabled petitioner to obtain beer, and he received beer shipments from new sources of supply. In addition, petitioner made direct sales of surplus crowns, receiving gross receipts from this source totaling approximately $41,000 during 1943, about $5,000 during the period from January 1, 1944, to June 30, 1944, and about $5,000 from July 1, 1944, to February 28, 1945. By the latter part of 1943 the manufacture of crowns from scrap had become widespread. Crowns were more plentiful but beer was becoming difficult to obtain. Before Gregory left for medical school petitioner discussed that problem with him, and they decided that Gregory should contact petitioner's supplier, Lemp Brewing Company, located in St. Louis, in order to get an increase in beer shipments. *219 Gregory had met the company's representative in Kansas City. During 1944 Gregory made several visits to that brewery, and he met socially with representatives of the brewery on about a half dozen occasions. As a result of those contacts the brewery company sold additional quantities of beer to the business, which in turn sold crowns to the brewery. During 1942 the business received 87,317 cases of beer, including 52,772 cases from Springfield Brewing Co., 16,062 cases from Minneapolis Brewing Co., 10,474 cases from Capitol Brewing Co., and 6,623 cases from Heileman Brewing Co. During 1943 it received 104,683 cases of beer, including 39,106 cases from Capitol Brewing Co., 28,413 cases from Lemp Brewing Co., and 27,539 cases from Blatz Brewing Co. During 1944 it received 147,116 cases, consisting of 82,024 cases from Blatz Brewing Co., 52,998 cases from Lemp Brewing Co., and 12,094 cases from Capitol Brewing Co. During 1945 it received 189,806 cases, including 92,095 cases from Lemp Brewing Co. and 83,473 cases from Blatz Brewing Co. During the years 1944 and 1945 Central Brew Sales Company was able to sell all the beer that it could procure. Profits during those years were the highest *220 in the history of the business. Prior to June 25, 1943, Gregory received no salary for his services. None of petitioner's employees had written employment contracts. The books of account show that from June 25, 1943, to May 19, 1944, petitioner paid Gregory a salary of $50 a week. Those payments aggregated $1,400 for the calendar year 1943 and $1,000 for the calendar year 1944. In the summer of 1944 it was anticipated that Gregory would be away at school for about three years. For some time prior to July 1, 1944, petitioner and Gregory had understood that Gregory would be taken into the business as a partner when he became of age. Gregory could not become a partner sooner because an individual under 21 years could not hold a license to sell beer or liquor. He became of age May 5, 1944. On July 1, 1944, by "Bill of Sale," petitioner assigned to Gregory a 40 per cent interest in the business for a consideration of $6,000. On the same date petitioner and Gregory executed an "Agreement of Partnership" under which they agreed to carry on the business as partners. Petitioner was to serve as "active head and manager" and to receive $500 per month as a salary for his services. The balance *221 sheet of the business as of July 1, 1944, shows total assets of $39,438, total current liabilities of $18,334.90, a liability due to petitioner of $6,103.19, and net worth of $15,000. The net worth of the sole proprietorship as of June 30, 1944, was $21,103.19. Petitioner did not convey to the company the building in which the business was located. On July 1, 1944, Gregory had at least $6,000 on hand. On July 1, 1944, Gregory was credited on petitioner's records with the receipt of $3,000, representing the amount previously held by petitioner for Gregory's benefit. On the same day, Gregory executed a promissory note to petitioner for $3,000. Gregory paid off the note in yearly installments: $1,000 was paid on November 9, 1945, with funds drawn from Gregory's savings account, representing savings by Gregory out of his prior salary from the business; $1,000 plus interest was paid on August 2, 1946; and a like amount plus interest was paid on May 19, 1947. The latter instalments were paid with funds drawn by petitioner with Gregory's authorization from a safe deposit box, maintained in the name of petitioner and Gregory, in which Gregory kept his savings, gifts from petitioner and other *222 relatives, and accumulated earnings from professional singing, the funds having been placed therein by petitioner on Gregory's behalf. No part of the sums given to or earned by Gregory were used for his support, which was furnished by petitioner throughtout the period that Gregory was in school. Subsequent to July 1, 1944, various Federal, State, and local wholesale beer licenses were issued to petitioner and Gregory, operating under the trade name of "Central Brew Sales Company." Subsequent to that date Federal and State Social Security account numbers were issued to petitioner and Gregory, operating under the same trade name. On May 12, 1944, a new bank account was opened in the name of the company at Produce Exchange Bank, and both petitioner and Gregory signed a signature card authorizing either to draw against the account. On or about July 1, 1944, Gregory's name was added to the sign on the company's building. In the latter part of 1944 office stationery and business advertising indicated that the business was operated by petitioner and Gregory. On December 14, 1944, a "Registration of Fictitious Name," signed by petitioner and Gregory, was filed for the company in the office *223 of the Secretary of State of Missouri. From July 1, 1944, until June 1948, Gregory spent most of his time at school in St. Louis, coming to Kansas City for short vacations of approximately one or two weeks each year. His contacts with Lemp Brewing Company continued throughout his stay in St. Louis, and subsequent to July 1, 1944 substantial shipments of beer were received from that company. Gregory's other services have been advisory in nature, involving questions of new sources of supply, new customers and policy. Subsequent to July 1, 1944, Gregory never drew a salary from the company. He is now a resident physician at Wadsworth Veterans' Hospital, Leavenworth, Kansas. Subsequent to July 1, 1944, petitioner was the active head and manager of the business. He supervised the salesmen and office personnel, contacted breweries and made purchases and sales of beer. He received a salary of $6,000 each year for his services. Petitioner's individual return for 1943 showed net profit from the business of $19,079.76. His return for 1944 showed net profit from the business of $19,676.74 for the period January 1, 1944, to June 30, 1944. The partnership return for the fiscal period July 1, 1944, to *224 February 28, 1945 reported net income of $14,794.88. Subsequent to July 1, 1944, the books of the company show credits to Gregory's capital account to the extent of 40 per cent of the net earnings exceeding petitioner's salary, and show charges for all withdrawals made by Gregory. Profits in the amount of $4,250.85 were credited to his account at the conclusion of the fiscal period ending February 28, 1945. Aggregate withdrawals by Gregory between July 1, 1944, and February 28, 1945, totaled $1,700. No part of that money was used to pay Gregory's income tax upon his distributive share of the business earnings for that period. A subsequent withdrawal by Gregory was made to pay tax on his distributive share of the earnings for the fiscal year ended February 28, 1945. Withdrawals by Gregory have been made from time to time without any restriction, and have been made in each fiscal year through February 28, 1950. Gregory's tax returns have reported a distributive share of the business profits. Respondent's notice of deficiency determined, among other matters, that deductions for salaries paid to Gregory were excessive in the amount of $900 for 1943 and $500 for 1944, and that "the *225 arrangement under which your son, Gregory Pucci, purportedly acquired a forty per cent interest in your business, did not constitute a bona fide partnership, for income tax purposes." Reasonable compensation for the services rendered by petitioner's son was $1,400 for 1943, and $1,000 for 1944. Petitioner and his son actually intended in good faith and with business purpose to carry on business together as bona fide partners. Opinion This is not the usual attempt on the part of a father to create a synthetic partnership with an ineffectual minor child. For several years prior to reaching his majority petitioner's son had been making valuable contributions to the business which had for many years made use of his capital. [1] His services were not of a minor or routine nature but included ideas and successful contacts, which the facts show were obviously instrumental in permitting the business to achieve a high level of earnings. There was an adequate reason for postponing the formal partnership until the son's majority and reasonable promptness in creating it thereafter. Although the time available to the son for rendering services was limited, the value of what he did was obviously *226 real and unmistakable. In view of all the circumstances, we consider no other finding warranted than that petitioner did in fact intend to conduct the business in partnership with his son. For similar reasons we have found that the salary paid to the son prior to his entrance into the partnership was reasonable, considering the value to the business of the services performed. On both issues the deficiency is disapproved. Decision will be entered under Rule 50. Footnotes
1. The minor son's capital could not have been a gift to petitioner, and petitioner's act in employing it in the business could have been disaffirmed when the son reached his majority, , unlike such situations as [51-1 USTC [*] 9133], reversing T.C. memorandum opinion [, CCH Dec. 17,433(M)], where the wife had given money to the taxpayer many years before without any accompanying thought of participating in the enterprise.↩